UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

PARSONS &  WHITTEMORE
ENTERPRISES CORP., PARSONS &
WHITTEMORE, INCORPORATED,
GEORGE F. LANDEGGER, and EVA
LANDEGGER,

                            Plaintiffs,

               - against -

ARTHUR L. SCHWARTZ and LOUISE H.
SCHWARTZ,

                         Defendants.

-------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

08 Civ. ___

# 08 CIV. 2084

Plaintiffs Parsons & Whittemore Enterprises Corp. ("PWE"), Parsons &

Whittemore, Incorporated ("P&W"), George F. Landegger, and Eva Landegger ("the

Landeggers"), by and through their attorneys, Morvillo, Abramowitz, Grand, Iason, Anello &

Bohrer, P.C., for their complaint, allege as follows:

## NATURE OF THE ACTION

       1.      In this action, plaintiffs seek to recover assets which defendant Arthur L.

Schwartz ("Schwartz") has secreted away by, among other things, ██████████████

████████████████████████████████████████████████████████████████.

Schwartz – a longstanding officer and director of the corporate plaintiffs and a trusted tax and

financial advisor, attorney, and fiduciary of their Chairman and controlling shareholder, George

F. Landegger, and his wife, Eva Landegger – conveyed those assets while engaged in willful

malfeasance against the plaintiffs, in an effort to render himself judgment-proof.  Accordingly,

plaintiffs seek to set aside those transfers as fraudulent and reach those assets in Mrs. Schwartz's

custody for recovery of claimed damages in a separate, pending action in this jurisdiction, Parsons & Whittemore Enters. Corp. v. Schwartz, 03 Civ. 873 (CLB) (the "First Action"). Underlying that action as well as this one is the fact that Schwartz, a highly experienced tax attorney whom the Landeggers entrusted to prepare and file their federal and state income tax returns, failed to file the returns and, instead, embarked upon an elaborate scheme to hide this failure from not only the corporate plaintiffs and the Landeggers, but also from the taxing authorities.

2.      Plaintiffs did not learn of Schwartz's fraudulent transfers until after the First Action was instituted and Schwartz admitted for the first time, at his May 2, 2007 deposition in that action, that he ████████████████████████████ ████████████████████████████████████████████ ████████████████████████. Similarly, due to Schwartz's strenuous, systematic and comprehensive efforts to conceal his wrongdoing, plaintiffs did not discover Schwartz's wrongdoing which is at issue in the First Action until the Spring of 2002. His extensive cover-up efforts have entailed, among other things, misappropriating corporate funds and withholding dividends due to Mr. Landegger and then allowing them to be recorded in a false and misleading fashion on the corporate plaintiffs' books, diverting tax payments by the Landeggers, creating various false documents, consistently lying to the Landeggers, the corporate plaintiffs' employees, government agents, and others, and lying at his deposition in the First Action.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims in this lawsuit arose in this district.

## PARTIES

5.      Plaintiff PWE is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Rye Brook, New York. PWE is the parent company of a group of companies that include P&W.

6.      Plaintiff P&W is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Rye Brook, New York.

7.      Plaintiff George F. Landegger is a citizen of the State of Connecticut. Mr. Landegger is the current Chief Executive Officer and Chairman of the Board of Directors of both PWE and P&W, and owns the majority of voting shares of PWE.

8.      Plaintiff Eva Landegger is a citizen of the State of Connecticut. Mrs. Landegger has been married to George F. Landegger for 35 years.

9.      Upon information and belief, defendant Schwartz is a citizen of the State of New Jersey. Prior to P&W's termination of his employment for cause on April 29, 2002, Schwartz had been President of P&W and PWE since 1986, and a member of each company's Board of Directors.

10.     Upon information and belief, defendant Mrs. Schwartz is a citizen of the State of New Jersey and is the wife of defendant Schwartz.

3

## FACTUAL ALLEGATIONS

### BACKGROUND

**I.    PARSONS & WHITTEMORE**

11.    The privately held Parsons & Whittemore group of companies (the "PW Group") engineered, constructed, and operated pulp and paper mills around the world.  It currently operates and markets the production of two pulp mills in Alabama, making it a leader in the manufacturing and marketing of pulp.

12.    PWE is the corporate parent of the PW Group and P&W is an operating subsidiary.  PWE is itself essentially a holding company with little or no direct activity.  PWE does not pay federal taxes, either individually or for the consolidated group.  Its subsidiary, P&W, is the federal taxpayer for the PW Group.  PWE's and P&W's corporate offices currently are located at 4 International Drive, Rye Brook, New York.  PWE is a closely-held corporation, all the shares of which are ultimately owned by the Landegger family.  George F. Landegger owns the majority of the voting shares of PWE.

**II.    THE LANDEGGER-SCHWARTZ RELATIONSHIP**

13.    George Landegger first came into contact with Arthur Schwartz when Schwartz was an associate at the distinguished New York City tax law firm, Roberts & Holland, which served as tax and estate counsel for the Landegger family during the 1970s and 1980s. Schwartz received his law degree and his LL.M. (Masters of Law) in taxation from New York University in the mid-1960s and, prior to joining Roberts & Holland, practiced with the United States Treasury Department and the New York City Tax Department.

14.    In connection with Roberts & Holland's work overseeing Mr. Landegger's father's estate, the firm relocated Schwartz to P&W's office. In or about November 1976, Schwartz became directly retained by P&W as its tax counsel. In addition to his duties as tax counsel for closely held P&W, Schwartz subsequently began to assume the role of a personal tax advisor and lawyer to various members of the Landegger family, including George F. Landegger. In or about 1977, due to Schwartz's reputation, education, experience, and apparent legal and tax expertise, Mr. Landegger entrusted him with the preparation and filing of his personal tax returns, which were filed jointly with Mr. Landegger's wife, Eva Landegger.

15.    As the business relationship between Messrs. Landegger and Schwartz developed, Schwartz assumed a greater degree of authority at P&W. In 1986, Schwartz was promoted to the position of President of P&W and most of its affiliates. As such, he was responsible for overseeing the company's financial, personnel, insurance, legal, and tax matters and had the authority to approve legitimate company expense payments.

16.    Schwartz entered into an employment agreement with P&W effective as of December 15, 1988 (the "1988 Agreement"). Along with the employment agreement, the parties entered into a "Stock Option Deferred Compensation Agreement," (the "Deferred Compensation Agreement"), under which Schwartz would receive significant cash payments over the course of twenty years. At the time Schwartz entered into the 1988 Agreement and the Deferred Compensation Agreement, he had already begun his willful malfeasance. For example, the earliest available IRS statement of account indicates he did not prepare or timely file the Landeggers' tax returns for every year from 1985 to 1990 inclusive. Further, in 1992, Schwartz caused PWE to issue unauthorized checks and apply them to the Landeggers' taxes, interest and penalties for the tax years 1985 to 1990 inclusive.

5

17.    In mid-1995, although Schwartz's 1988 Agreement was still in effect, Schwartz used false pretenses to enter into a new employment agreement with P&W, which he signed on or about July 24, 1995 (the "1995 Agreement"). Schwartz dictated the provisions of the 1995 Agreement so that P&W could only terminate Schwartz "for cause" for "conviction of, or plea of guilty or nolo contendere to, a felony, or theft of the property of the Company or a subsidiary or affiliate," unlike the 1988 Agreement that more broadly defined "cause" as "dishonest or fraudulent actions or willful misconduct." In fact, at the time the 1995 Agreement was executed, Schwartz was already in violation of the 1988 Agreement's termination for cause provision.

18.    Schwartz was amply rewarded for his service to P&W, receiving a generous salary, deferred compensation, and bonuses. Between 1985 and 2002, Schwartz's compensation from Landegger/P&W sources was more than $21.7 million.

19.    Until Schwartz's outrageous misconduct was discovered in 2002, the Landeggers trusted Schwartz completely as a fiduciary, attorney and friend. By the 1980s, Schwartz also had become the primary advisor to Mr. Landegger with respect to Mr. Landegger's personal investments, was often delegated the responsibility of conducting negotiations in connection with those investments on Mr. Landegger's behalf, and was Mr. Landegger's principal legal advisor. Prior to Schwartz's termination, Mr. Landegger's will directed Mrs. Landegger to vote the majority shares in PWE she stood to inherit in accordance with Schwartz's instructions. Moreover, Mr. Landegger's will named Schwartz as the co-executor of his estate and named him as the successor guardian of the Landeggers' minor children and the trustee of their trusts.

### III.    THE PREPARATION OF THE LANDEGGERS' TAX RETURNS

20.    In or about 1977, Schwartz willingly assumed responsibility for preparing and filing the Landeggers' tax returns.  Since that time, Mr. Landegger forwarded to Schwartz, either directly or through his executive assistant, information regarding the Landeggers' personal finances, income and deductions to enable Schwartz to calculate their estimated taxes and to prepare their jointly filed tax returns.

21.    Whenever Schwartz presented the Landeggers with tax returns for their signature, they promptly signed the returns and gave them back to Schwartz for filing. Periodically, Schwartz instructed Mr. Landegger to issue checks to various taxing authorities, explaining that the checks were required to pay taxes and estimated taxes to such authorities. Mr. Landegger would always follow Schwartz's instructions by signing the checks Schwartz had caused to be prepared and by turning these checks over to Schwartz for forwarding to various taxing authorities.  The Landeggers also granted written powers of attorney to Schwartz to deal with the taxing authorities on their behalf.  On numerous occasions, Schwartz assured Mr. Landegger that the Landeggers' tax returns had been filed in a timely fashion.

### SCHWARTZ'S MALFEASANCE AND ITS DISCOVERY

### I.    SCHWARTZ'S FAILURES IN FILING THE LANDEGGERS' STATE AND FEDERAL TAX RETURNS

#### A.    Federal Income Tax Returns

22.    Between at least 1985 and 2001, unbeknownst to the Landeggers, Schwartz repeatedly failed to file their federal tax returns timely or correctly, causing them to incur substantial penalties and interest for late filing, failure to pay, fraud, and inadequate estimated taxes – ultimately resulting in million of dollars in IRS assessments.  Moreover,

Schwartz routinely waited until assessments had been proposed by the IRS to file the

Landeggers' returns. Schwartz also often told Mr. Landegger that in order to facilitate

Schwartz's dealings with the IRS on behalf of the Landeggers, they should grant him a written

power of attorney. Based on Schwartz's apparent legal and tax expertise and Mr. Landegger's

complete trust and confidence in Schwartz, Mr. Landegger accepted Schwartz's representations,

and the Landeggers granted him several written powers of attorney at different times. Pursuant

to the powers of attorney, Schwartz accepted the IRS's assessments, without the Landeggers'

knowledge. Then, Schwartz had the Landeggers' tax, interest, and penalty assessments paid, for

at least the tax years 1985 onward, by utilizing PWE's and P&W's funds without authorization

and by fraudulently soliciting Mr. Landegger to issue personal checks based upon

misrepresentations that the purpose of the checks was for current year estimated tax liabilities.

     23.    As a result of Schwartz's repeated failure to file the Landeggers' tax

returns, the IRS periodically sent the Landeggers requests for copies of their past returns.

Because Schwartz was the Landeggers' tax advisor, Mr. Landegger would give these requests to

Schwartz and ask why the IRS was seeking copies. Schwartz always responded that the IRS had

misplaced the returns or otherwise made a mistake – such as a computer error – but he would

"take care of it" by sending duplicate copies to the IRS and/or meeting with tax officials to

"straighten out" the matter. More than once, Schwartz had the Landeggers execute a "second

set" of returns or "amended" returns and misrepresented to the Landeggers that these returns

would replace the returns the IRS had "lost."

     24.    In addition to lying to the Landeggers, Schwartz also repeatedly lied to

IRS agents. For example, Schwartz falsely told IRS examiner John Dubiansky that he had filed

the Landeggers 1995 through 1997 tax returns, when he had not done so. Schwartz also

repeatedly lied to IRS officers Peter Vonderbank and Sarah Lauriat concerning the filing of the Landeggers' tax returns, falsely telling them in 2000 and 2001 that the Landeggers' 1996 through 1999 tax returns had been filed, although they had not, and that he was looking for copies of the returns. In fact, those returns were only filed by Schwartz in January 2001, after Lauriat threatened to bypass Schwartz's power of attorney and go directly to Mr. Landegger.

25.    Also, IRS examiner Joel Pupps asked Schwartz for copies of the Landeggers' 1991 through 1993 federal tax returns. In response, Schwartz gave him documents, falsely claiming (1) that they were copies of the Landeggers' 1991 through 1993 federal tax returns, (2) which had been filed with the IRS, and (3) that the IRS had lost the filed originals. Furthermore, Schwartz gave Pupps falsified versions of his own 1992 and 1993 federal returns, after Pupps had asked him for copies.

26.    Schwartz not only misled the Landeggers as to how he was handling the preparation and filing of their tax returns, but he also instructed Mr. Landegger to overpay estimated taxes, then used his powers of attorney to misdirect those tax payments, resulting in additional damages to the Landeggers.

27.    In early 1999, Schwartz advised Mr. Landegger to make a $5 million estimated tax payment to the IRS, in connection with Mr. Landegger's receipt of a $13 million dividend in that year. Schwartz then submitted the payment with a 1998 tax extension form, instead of having it applied to Mr. Landegger's 1999 taxes. Because no such payment was due for 1998, the IRS notified the Landeggers that they were due a refund of nearly $5 million. The Landeggers, however, never received this money after being informed by Schwartz that the IRS had erroneously determined that the Landeggers were owed a refund and that Schwartz would "take care" of the problem. Furthermore, when Schwartz prepared and filed the Landeggers'

9

1995 through 1999 returns with the IRS, neither the $13 million dividend nor the $5 million payment was reflected anywhere on any of the returns.

28.    Similarly, in 2000, Schwartz misdirected a $4.144 million estimated tax payment made by Mr. Landegger in connection with the 1999 sale of a foreign business. Schwartz sought assistance regarding the tax consequences of that sale from the law firm of Stroock & Stroock & Lavan LLP.  As Schwartz knew, the estimated tax payment was based on the Stroock firm's advice and was meant to assure favorable tax treatment to the Landeggers. After Schwartz requested the $4.144 million check from Mr. Landegger, he did not use it for the intended purpose.  Instead, Schwartz had the IRS apply $3.8 million of it to, *inter alia*, earlier year fraud and late-filing penalties and interest that the Landeggers unknowingly had incurred because of Schwartz's outrageous malfeasance.  Furthermore, although the Landeggers' $4.144 million estimated tax payment was intended to be applied to tax year 1999, this payment is not reflected anywhere on the Landeggers' 1995 through 1999 income tax returns filed by Schwartz in January 2001.

29.    Schwartz also deprived the Landeggers of the benefits of substantial federal income tax refunds.  In 2001, the Treasury issued refund checks to the Landeggers totaling more than $300,000.  Schwartz told Mr. Landegger that the refund checks were a mistake, not to cash the checks, and to give them to Schwartz.  Mr. Landegger did so, believing that Schwartz would contact the IRS and return the checks.  The checks were discovered in Schwartz's files after he had been terminated, and the checks long had become void.

**B.    State Income Tax Returns**

30.    Schwartz's mishandling of the Landeggers' Connecticut and New York State tax returns was as outrageous as his mishandling of their federal returns.  Although

10

Schwartz knew that Mr. Landegger was at all relevant times a Connecticut resident employed in New York, he repeatedly failed to file their New York State non-resident tax returns and their Connecticut returns, resulting in substantial penalties.

31.    Eventually, New York obtained the Landeggers' federal tax information from the IRS and proposed assessments. New York's assessments were grossly overstated, though, because the Landeggers' federal taxable income included income that was not subject to taxation by New York State. Nonetheless, pursuant to his powers of attorney, Schwartz accepted these overstated assessments, which also included penalties resulting from his failure to file the Landeggers' New York returns, and satisfied more than $2 million of these inaccurate assessments by, among other things, abusing his ability to access and utilize corporate funds and fraudulently obtaining money from the Landeggers. Moreover, when Mr. Landegger received the $13 million dividend in 1999, Schwartz advised him to make a $475,000 estimated tax payment to New York State, even though New York was not entitled to tax that income.

32.    In 1995, Schwartz likewise failed to file California tax returns for Mr. Landegger in connection with his sale of a house there. Instead, as he had routinely done with the Landeggers' federal and New York taxes, Schwartz waited for an assessment to be proposed, and in March 1998, without the Landeggers' knowledge, used PWE funds to pay the outstanding 1995 California tax and late filing penalties.

## II.    SCHWARTZ DEFRAUDED PWE AND P&W TO CONCEAL HIS FRAUD ON THE LANDEGGERS

33.    From 1992 through 2001, Schwartz used company funds to conceal his willful malfeasance regarding the Landeggers' tax returns for the tax years 1985 on. Without authorization and without disclosing to anyone the true purpose of these checks, he instructed

PWE's Assistant Treasurer, Jose Alvelo, to have PWE issue 33 checks totaling $2,200,217.46 and P&W's Accounts Payable Supervisor to have P&W issue two checks totaling $496,289.99 to federal and state taxing authorities in connection with the Landeggers' personal taxes, for an aggregate of $2,696,507.55. Schwartz misled PWE and P&W employees into believing that the checks were either ordinary tax payments made on behalf of the companies (which he later annotated with Mr. Landegger's social security number or initials) or tax payments advanced on behalf of the Landeggers, made with their authorization and consent. Under normal circumstances, PWE's and P&W's checks were signed by the Assistant Treasurer and the Chief Financial Officer, but these unauthorized checks were signed by Schwartz and Mr. Alvelo, whose employment could have been terminated at Schwartz's discretion and whose compensation was subject to Schwartz's discretion.

34.     At no time did the Landeggers ever authorize Schwartz to use these company funds to pay their tax liabilities. Unbeknownst to the Landeggers, Schwartz delivered these checks to state and federal taxing authorities in order to pay various assessments, including interest and late-filing penalties, made by the respective taxing authorities against the Landeggers. Deceived by Schwartz into believing that the Landeggers had authorized such payments, PWE and P&W employees permitted company checks to be issued which Schwartz used to fraudulently conceal his failures in filing the Landeggers' income tax returns. Copies of many of the checks issued by PWE and P&W were discovered in Schwartz's files following his termination.

## III.    SCHWARTZ'S MISAPPROPRIATION OF PWE DIVIDENDS OWED TO GEORGE LANDEGGER AND OF PWE AND P&W FUNDS

35.     Another manner in which Schwartz fraudulently concealed his misappropriation of over $2.6 million from PWE and P&W was to intercept money PWE owed

to Mr. Landegger in the form of dividends. In 1990, 1991 and 1992, PWE declared dividends and issued checks to shareholders. Schwartz distributed the checks, with the exception of the nearly $1.4 million in dividends due to Mr. Landegger. Schwartz used that money as a "slush fund" from which to pay the penalties and interest that the Landeggers had incurred due to Schwartz's failure to file their tax returns properly. On at least three separate occasions, P&W employees told Schwartz that Mr. Landegger's dividend checks remained outstanding. Schwartz responded by saying the checks must have been lost and requested that they be reissued. Schwartz then withheld from Mr. Landegger the reissued checks, which were found in Schwartz's files after he was fired in 2002. Though Mr. Landegger never received the checks, he nevertheless incurred taxes on the dividends, plus interest and penalties.

36.     Schwartz not only misappropriated PWE and P&W funds to conceal his fraud on the Landeggers, he misappropriated P&W funds in connection with his own taxes. An analysis of P&W company records indicated that Schwartz used over $135,000 in company funds to pay his own tax liabilities without obtaining any authorization to do so and failed to repay P&W $42,368.66 of that amount.

## IV.    THE DISCOVERY OF SCHWARTZ'S MISDEEDS WITH REGARD TO THE LANDEGGERS' TAXES AND THE MISAPPROPRIATION OF FUNDS

37.     On or about October 26, 2001, the Criminal Investigation Division of the IRS served Schwartz with a summons addressed to P&W requesting various documents in connection with the IRS's criminal investigation of Mr. Landegger for tax years 1995 through 1999. At that time, Mr. Landegger had no knowledge that he was the subject of any investigation. Schwartz did not inform anyone about the investigation until mid-November 2001, when P&W's general counsel, Maria Fulgieri, confronted him after learning about the investigation from an attorney representing Schwartz in a criminal investigation of his own taxes.

On December 3, 2001, under pressure from Ms. Fulgieri, Schwartz finally told Mr. Landegger about the summons and investigation.

38.    On February 12, 2002, Mr. Landegger met with IRS special agents in order to provide handwriting exemplars. At that meeting, the agents told Mr. Landegger that Schwartz had not filed the Landeggers' tax returns for the years 1995 through 1999 until January 2001. Even thereafter, Schwartz continued to claim that he had filed the Landeggers' returns on time and stated that he would look through his files at home for copies of the returns. For several weeks, Schwartz told Mr. Landegger that he was still searching for the "copies," but he later stated that he could not locate the "copies."

39.    After the Landeggers' counsel retained a forensic accountant, Leon M. Reimer, CPA, to review their taxes, Schwartz lied to him as well, telling him on March 19, 2002 and April 8, 2002 that all of the Landeggers' federal returns for 1995 through 1999 had been timely filed. However, Mr. Reimer's subsequent investigation revealed that, besides failing to timely file the Landeggers' 1995 through 1999 federal returns, Schwartz also had failed to timely file their 1985 through 1994 federal returns, had not filed their New York State non-resident returns between at least 1987 and 1999, or their Connecticut tax returns at all. The Landeggers learned that Schwartz had caused them to incur millions of dollars worth of unnecessary taxes, interest and penalties in those years and that Schwartz misappropriated company funds to cover up his failures in filing the Landeggers' tax returns. After discovering Schwartz's misbehavior towards the corporate plaintiffs, on April 29, 2002, P&W terminated Schwartz's employment for cause.

## V.    SCHWARTZ'S GUILTY PLEA

40.    As a result of Schwartz's lies to IRS officials with regard to the Landeggers' taxes and his own taxes, on January 4, 2006, Schwartz pled guilty to two federal felonies.  Specifically, he pled guilty to two counts of making false statements in violation of 18 U.S.C. § 1001.

41.    The first felony count to which Schwartz pled guilty arose from false statements that Schwartz made to revenue agents and officers of the IRS in connection with the Landeggers' taxes for the tax years 1996 through 1999.  In this connection, Schwartz repeatedly lied to the IRS, claiming that the Landeggers' tax returns for the years 1996 through 1999 had been filed when he knew that this was false.  In particular, Schwartz admitted that:

(1)    On March 29, 1999, an IRS Revenue Agent who was conducting a civil audit at P&W issued an Information Document Request ("IDR") to P&W requesting copies of the Landeggers' individual federal income tax returns, Forms 1040, for the tax years 1995, 1996 and 1997.

(2)    In response to the P&W IDR, Schwartz falsely stated to the IRS Agent that the Landeggers' returns at issue had been filed.  Schwartz told the Agent that he would provide copies of the returns to the Agent, but he did not produce any such copies in response to the P&W IDR.

(3)    On or about June 21, 1999, the IRS issued an Examination Letter initiating an examination of individual federal income tax returns, Forms 1040, for the Landeggers for the tax years 1995, 1996 and

1997, and requesting, among other things, that the Forms 1040 at issue be produced.

(4)     On or about July 12, 1999, Schwartz submitted to the IRS Agent a Power of Attorney naming Schwartz as Power of Attorney for the examination of the Landeggers' returns.

(5)     On or about July 15, 1999, the IRS issued an IDR for the Landeggers' individual federal income tax returns, Forms 1040, for the tax years 1995 to 1997, this time in connection with the examination of the Landeggers' returns.

(6)     Schwartz produced no copies of any such tax returns to the IRS in response to the July 15, 1999 IDR, but continued to falsely state to the IRS Agent and the IRS that the tax returns at issue had been filed.

(7)     In about March 2000, the Collection Division of the IRS opened a case concerning the personal returns for the Landeggers for tax years 1995 to 1999.

(8)     From about April 2000 to about January 2001, Schwartz falsely represented to the Revenue Officer in the Collection Division that the Landeggers' tax returns for 1996 to 1999 had been prepared and filed, and that he would provide the Revenue Officer with copies of them, when in fact, as Schwartz then knew, the returns had not been filed.

42.     The second felony count to which Schwartz pled guilty arose from false statements that Schwartz made to agents and officers of the IRS in connection with his own taxes for the tax years 1992 and 1993. Specifically, Schwartz admitted that:

(1)     On or about November 13, 1996, an IRS Revenue Agent who was conducting a civil audit at P&W asked Schwartz to provide him with copies of Schwartz's federal individual income tax returns for tax years 1992 and 1993.

(2)     On or about December 10, 1996, Schwartz provided copies of his 1992 and 1993 returns to the IRS Revenue Agent, representing that they were copies of the tax returns he had filed with the IRS for those two years. These copies provided to the IRS Revenue Agent disclosed dividend and capital gain income attributable to an entity identified as "Louarte," while the 1992 and 1993 individual tax returns Schwartz previously had filed with the IRS contained no reference to "Louarte" or reported any income from that source.

(3)     When Schwartz provided the copies of his 1992 and 1993 returns to the IRS Revenue Agent on December 10, 1996, Schwartz was aware of the differences between those copies and the returns he actually had filed with the IRS and knew that they were not copies of the returns he had filed with the IRS.

## VI.    SCHWARTZ'S FRAUDULENT CONCEALMENT OF HIS MISCONDUCT AND HIS ATTEMPTS TO RENDER HIMSELF JUDGMENT PROOF

43.     Schwartz's fraudulent concealment of (a) his non-filing of the Landeggers' state and federal tax returns, (b) his misappropriation of PWE and P&W funds, and (c) his misappropriation of Mr. Landegger's dividend checks, prevented the Landeggers, PWE, and P&W from learning of their claims against Schwartz underlying the First Action until early Spring 2002. Although the Landeggers made inquiries of Schwartz regarding tax notices they

17

received and the corporate plaintiffs had procedures in place to detect possible misuse of

company funds, Schwartz was able to evade detection through his gross abuse of his position of

authority within the corporate plaintiffs and the trust the plaintiffs placed in him as their

fiduciary and attorney. Likewise, Schwartz used a system of lies, delay and evasion to keep

plaintiffs from discovering that, while he was concealing his ongoing misconduct and abuse of

fiduciary duty, he was secreting his assets in anticipation of the day that his egregious

misconduct would be discovered.

      44.     In February 2003, plaintiffs brought the First Action to recover monies

lost because of Schwartz's misconduct, legal and accounting fees incurred in redressing the harm

that he caused, and punitive damages. Those monies are sought from Schwartz, who had earned

approximately $21.7 million in connection with his employment at P&W between 1985 and

2002. Moreover, Schwartz had outside investments which garnered him, upon information and

belief, millions of dollars in additional income.

      45.     On March 18, 2004, Schwartz answered the Amended Complaint in the

First Action by asserting his Fifth Amendment privilege with respect to virtually every

allegation, along with 22 defenses.

      46.     On September 6, 2005, the Court in the First Action granted partial

summary judgment to PWE and P&W, holding Schwartz liable for their claims of breach of

fiduciary duty, breach of good faith, breach of contract, conversion, unjust enrichment, and

money had and received.

      47.     Discovery commenced in the First Action on September 5, 2006. In

connection with plaintiffs' punitive damages claims, plaintiffs' first document requests in

October 2006 requested documents sufficient to show Schwartz's net worth. Schwartz initially

refused to produce those documents. Then, in January 2007, Schwartz produced a copy of a financial statement he previously had submitted to the United States Department of Probation for purposes of sentencing following his 2006 guilty plea in the United States District Court for the District of Connecticut (the "Financial Statement"). The Financial Statement revealed that ███

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████.

48.    ██████████████████████████████████████

████████████████████████████████████████████

██████████████. Given ████████████████████████ (as well as

Schwartz's failure to comply with plaintiffs' document request), at a March 1, 2007 conference with the Court in the First Action, plaintiffs sought additional documents from Schwartz concerning his financial condition. At that conference, the Court ruled that plaintiffs should depose Schwartz concerning his net worth and financial condition before seeking further document production.

49.    During Schwartz's deposition in the First Action on May 2, 2007, plaintiffs had their first opportunity to question Schwartz regarding ████████████████

████████████████████████████████████ In the course of that deposition, Schwartz made several noteworthy admissions:

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████



50.

Indeed, Schwartz made these transfers to stymie plaintiffs' ability to collect a judgment based upon Schwartz's misconduct. Furthermore, Schwartz made these transfers while he was receiving taxing authority notices documenting the dollar figures associated with his willful malfeasance, and misappropriating assets by having checks cut in specific amounts and by secreting away Mr. Landegger's dividend

checks.  In short, Schwartz's transfers were made at a time when he clearly was able to calculate his substantial liability to plaintiffs.



54.    Shortly after plaintiffs' discovery of these fraudulent transfers, plaintiffs filed a motion for leave to file a second amended complaint in the First Action on July 30, 2007. Plaintiffs' motion papers included their proposed second amended complaint, which added allegations against Schwartz and Mrs. Schwartz under New York Debtor and Creditor Law ("NY DCL") §§ 273, 275, 276, 276-a, 278 and 279.  The Magistrate Judge assigned to the First Action

denied the motion for leave to amend, without prejudice to the filing of a new action asserting

such claims, which ruling was affirmed by the District Judge on January 18, 2008.

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (AVOIDING FRAUDULENT CONVEYANCES UNDER NY DCL §§ 273, 278 AND 279)

55.     Plaintiffs restate and reallege each of their allegations set forth in

paragraphs 1 through 54 of their complaint, *supra*, as if fully set forth herein.

56.     Schwartz's conveyances to Mrs. Schwartz (and to unknown third parties)

rendered him insolvent and were fraudulent as to creditors without regard to actual intent

because such transfers were made without fair consideration.

57.     Plaintiffs were Schwartz's creditors at the time of his conveyances to Mrs.

Schwartz and others.

58.     Accordingly, plaintiffs are entitled to set aside Schwartz's fraudulent

conveyances to Mrs. Schwartz and to obtain a judgment in this action against both Schwartz and

Mrs. Schwartz.

### SECOND CLAIM FOR RELIEF

### (AVOIDING FRAUDULENT CONVEYANCES UNDER NY DCL §§ 275, 278 AND 279)

59.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 58 of their complaint, *supra*, as if fully set forth herein.

60.     Schwartz's conveyances to Mrs. Schwartz (and to unknown third parties)

were made without fair consideration at a time when Schwartz intended or believed he would

incur debts beyond his ability to pay them as they matured and, as such, were fraudulent as to present and future creditors.

61.    Plaintiffs were present and future creditors of Schwartz at the time of his conveyances to Mrs. Schwartz and others.

62.    Accordingly, plaintiffs are entitled to set aside Schwartz's fraudulent conveyances to Mrs. Schwartz and to obtain a judgment in this action against both Schwartz and Mrs. Schwartz.

## THIRD CLAIM FOR RELIEF

## (AVOIDING FRAUDULENT CONVEYANCES UNDER NY DCL §§ 276, 278 AND 279)

63.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 of their complaint, *supra*, as if fully set forth herein.

64.    Schwartz's conveyances of his assets to Mrs. Schwartz (and to unknown third parties) were made with actual intent to hinder, delay, or defraud either present or future creditors and were fraudulent as to both present and future creditors.

65.    Plaintiffs were present and future creditors of Schwartz at the time of his conveyances to Mrs. Schwartz and others.

66.    Accordingly, plaintiffs are entitled to set aside Schwartz's fraudulent conveyances to Mrs. Schwartz and to obtain a judgment in this action against both Schwartz and Mrs. Schwartz.

67.    By virtue of Schwartz's and Mrs. Schwartz's willful, wanton and morally culpable conduct, the plaintiffs are entitled to recover punitive damages from them in the amount of $10,000,000.

## FOURTH CLAIM FOR RELIEF

### (ATTORNEY'S FEES UNDER NY DCL § 276-a)

68.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 67 of their complaint, *supra*, as if fully set forth herein.

69.     Schwartz's conveyances of his assets to Mrs. Schwartz (and to unknown third parties) were made with actual intent to hinder, delay, or defraud present or future creditors and were fraudulent as to both present and future creditors.

70.     Mrs. Schwartz received Schwartz's assets with actual intent to hinder, delay, or defraud Schwartz's present or future creditors.

71.     Plaintiffs were present and future creditors of Schwartz at the time of his transfers to Mrs. Schwartz and others.

72.     Accordingly, plaintiffs are entitled to their reasonable attorney's fees incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Arthur L. Schwartz and Louise H. Schwartz as follows:

(a)     On plaintiffs' first claim for relief, avoidance of Schwartz's transfers to Mrs. Schwartz and others and recovery of compensatory damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees;

(b)     On plaintiffs' second claim for relief, avoidance of Schwartz's transfers to Mrs. Schwartz and others and recovery of compensatory

damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees;

(c)    On plaintiffs' third claim for relief, avoidance of Schwartz's transfers to Mrs. Schwartz and others and recovery of compensatory damages in an amount to be determined at trial, punitive damages in the amount of $10,000,000, together with interest, costs, and attorneys' fees;

(d)    On plaintiffs' fourth claim for relief, reasonable attorney's fees in an amount to be determined at trial; and

(e)    awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated:  New York, New York
       March 3, 2008

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By: _____
       Edward M. Spiro (ES-1206)
       Barbara L. Trencher (BT-6722)
       Sarah J. North (SN-4558)
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Plaintiffs*

25